## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND ET AL., | * |
| Plaintiffs, | * |
| v. | * |
| CONTRACT WALLCOVERING INC. ET AL., | * |
| Defendants. | * |

\*

\*

\*

\*

Civil No. 23-1160-BAH

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## **MEMORANDUM OPINION**

The International Painters and Allied Trades Industry Pension Fund (the "Fund"), along with Daniel R. Williams as the Fund's fiduciary (collectively "Plaintiffs"), filed suit against Contract Wallcovering, Inc. ("Contract, Inc."), Contract Wallcovering, LLC ("Contract, LLC"), Creative Wallcovering, Inc. ("Creative"), Ronald J. Healy, and Elaine A. Healy (collectively "Defendants") seeking payment of withdrawal liability. ECF 17.[1]  Pending before the Court is Plaintiffs' Motion for Default Judgement (the "Motion"). ECF 25. The Motion includes a memorandum of law and exhibits.[2]  Though served in 2023, Defendants did not file an answer to Plaintiffs' lawsuit or file an opposition to the Motion. The Court has reviewed all filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). Accordingly, for the reasons stated below, Plaintiffs' Motion is **GRANTED**.

---

[1] Plaintiffs filed their original complaint at ECF 1 and the operative amended complaint at ECF 17.

[2] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

## I. BACKGROUND[3]

### A. Factual Background

The Fund operates as a multiemployer benefit plan and is headquartered in Hanover, Maryland. ECF 17, at 2 ¶ 3. Daniel R. Williams is the administrator of the Fund and a fiduciary, providing specialized services in the collection of withdrawal liability. *Id.* at 3 ¶ 4.

Contract, Inc., originally a Nevada corporation formed in 1999, was revoked and dissolved in or around 2002. ECF 17, at 3 ¶ 6a. Creative, formed and registered in 2007 as a Texas corporation, was lapsed by voluntary termination in or around 2009. *Id.* ¶ 6b. Contract, LLC, a Texas corporation formed and registered in 2016, had its charter, certificate, or registration forfeited by the Secretary of State of Texas on or about January 15, 2021. *Id.* ¶¶ 6c–d. Contract, Inc., Creative, and Contract, LLC constitute a single employer. *Id.* at 4 ¶ 9. Ronald J. Healy and/or Elaine A. Healy were the owners of Contract, Inc. after the revocation.[4] *Id.* ¶ 7. Defendants had an obligation to contribute to the Fund on or around January 1, 2002. *Id.*

On July 8, 2020, the Fund issued a Withdrawal Liability Notice and Demand letter ("Demand Letter") to Defendants, notifying them of its determination that Defendants had completely withdrawn from the Fund and demanding payment of the resulting withdrawal liability.

---

[3] In considering a motion for default judgment, the Court "accepts as true the well-pleaded factual allegations in the complaint as to liability." *Int'l Painters & Allied Trades Indus. Pension Fund v. Cap. Restoration & Painting Co.*, 919 F. Supp. 2d 680, 684 (D. Md. 2013) (citing *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780–81 (4th Cir. 2001)). ECF 17 integrates the original complaint (ECF 1) as its sole sub-filing. ECF 17, at 4 ¶ 10. ECF 1 is the only filing on record that includes the Demand Letter, the Calculation of Employer Withdrawal Liability document, a coupon book for withdrawal liability payments, the Default Letter, the civil cover sheet, and draft summonses for Defendants. All references to the complaint and the aforementioned documents are now made through ECF 17-1, as part of the amended and operative complaint.

[4] On or around February 23, 2023, Healy certified with the County of Denton, Texas, that he owned "Contract Wallcovering." ECF 17, at 4 ¶ 6e.

ECF 17-1, at 4 ¶ 11.[5]  The Demand Letter explained the rules governing withdrawal from the Fund, the circumstances under which the Fund determined that Defendants had withdrawn, the method used to calculate Defendants' unfunded vested benefit liability, and Defendants' rights to request a review.  *Id.* at 10–12.

The Demand Letter set Defendants' liability at $70,608 and offered Defendants the option to pay in full or through 23 monthly installments of $3,140 and a final payment of $1,267.  ECF 17-1, at 11; *see also id.* at 13 (detailing that the monthly payments would total $73,487, with $2,879 of that sum representing interest).  To date, however, Defendants have not paid the withdrawal liability, despite their obligation to make future payments towards the withdrawal liability.  ECF 17, at 5 ¶ 21, 7 ¶ 23.  Defendants were "required to begin payment of the installments no later than sixty (60) days after the date of [the demand letter] . . . ."· ECF 17-1, at 11.  Defendants had a "right to request a review of the determination . . . within 90 days after receipt of [the demand letter] . . . ."  *Id.* at 12.  Defendants neither made the first withdrawal liability payment nor submitted a timely request for review or arbitration by the Demand Letter's deadlines.  ECF 17, at 5 ¶¶ 14–16.  Because Defendants failed to respond, the withdrawal liability payment demand and its arbitrable determinations became final, due, and owing.  *Id.* ¶ 17.

On March 10, 2021, the Fund issued a letter ("Default Letter") to the Defendants, notifying them of their failure to make the first seven scheduled payments.  ECF 17-1, at 7 ¶ 23; *see also id.* at 22–23 (copy of the Default Letter sent to Defendants).  The Default Letter warned that if Defendants did not cure this delinquency—by remitting the first through seventh scheduled

---

[5] Plaintiff does not specify the exact date of its determination, stating only that it had "determined that [Contract Wallcovering, Inc.] and all trades or businesses under common control with it . . . had a complete withdrawal from [the Fund] during the 2012 [p]lan [y]ear."  ECF 17-1, at 10; *see also id.* at 13 (listing Defendants' withdrawal date as December 31, 2012).

payments, with interest as provided by 29 C.F.R. § 4219.32, within sixty (60) days of receipt of the Default Letter—it would result in default and acceleration of the entire outstanding withdrawal liability, plus accrued interest.[6] *Id.* at 22–23. Furthermore, the Default Letter warned that prompt payment was essential to avoid litigation and a resulting increase in liability due to additional interest, liquated damages, attorneys' fees and costs, all pursuant to 29 U.S.C. §§ 1132(g), 1145, and 1451(b). *Id.* at 23. Defendants have made no payments to date. *Id.* at 7 ¶ 24; *see also* ECF 25-4, at 1 ¶ 4.

### B. Procedural Background

On May 2, 2023, Plaintiffs filed a complaint against Defendants for the withdrawal liability. ECF 17, at 4 ¶ 10. The complaint and summons were subsequently served on Defendants on May 18, May 24, and June 7, 2023. *Id.* at 4 ¶ 13; *see* ECF 7-11. On July 13, 2023, the Court, observing the filed return of service and Defendants' lack of response to the complaint, ordered Plaintiffs to either file a motion for entry of default and default judgment, or to submit a report explaining why such motions would be inappropriate. ECF 12. On August 11, 2023, Plaintiffs informed the Court that discussions were underway with Defendants' counsel regarding a potential resolution of the lawsuit. ECF 13, at ¶¶ 1, 3. However, Defendants simultaneously deny receiving any of Plaintiffs' letters or the complaint itself.[7] *Id.* ¶ 2; ECF 17, at 4 ¶ 11. Defendants maintained

---

[6] Plaintiff's amended complaint does not seek to accelerate the liability; rather, it requests the court to enter judgment for all withdrawal liability payments currently due and owing, along with any payments that become due during the pendency of this action, up to the date of judgment against Defendants and for the benefit of the Fund. ECF 17, at 6 ¶ 21(1)(a); *see also* ECF 25-2, at 5 n.1 (considering that the Defendants denied receiving any notice, including the notice of default, the Fund did not pursue a claim for accelerated payment in the amended complaint).

[7] Plaintiffs contend that the complaint additionally provides notice of the Fund's assessment of withdrawal liability. ECF 17, at 4 ¶ 12; *see also* ECF 13, at ¶ 3 (indicating that knowledge of the notice began on the date service was completed).

that the claimed lack of notice will impact the issues to be litigated. ECF 13, at 1 ¶ 3. Considering the ongoing communication between counsel, Plaintiffs determined it was inappropriate to move for entry of default at that time, ECF 13, at 1 ¶ 4, but also advised that if the Fund decided to maintain the lawsuit, it would amend the complaint to reflect its changed understanding of the facts and to amend the claims and relief sought, *id.* at 1 ¶ 3.

On August 24, 2023, the Court ordered Plaintiffs to file a status report. ECF 14. On September 22, 2023, Plaintiffs responded by requesting additional time to evaluate Defendants' proposed settlement offer. ECF 15, at 1 ¶¶ 1–2. Plaintiffs also advised that if the case did not settle, the Fund would file an amended complaint. *Id.* at 1 ¶ 2. On October 26, 2023, Plaintiffs filed an amended complaint.[8] ECF 17.

On September 20, 2024, the Court ordered Plaintiffs to file a status report. ECF 18. Plaintiffs responded on October 1, 2024, indicating that efforts to resolve the matter through communication with Defendants' counsel were unsuccessful.[9] ECF 19, at ¶ 5. Subsequently, on November 15, 2024, Plaintiffs requested the Court to enter default against Defendants pursuant to Fed. R. Civ. P. 55(a). ECF 21. On November 19, 2024, the Clerk, noting Defendants' expired period to file or serve any response, entered an order of default against Defendants. ECF 22; *see also* ECF 23 (Court's notice of default entered against defendants). As Defendants have taken no action to demonstrate an intent to defend the lawsuit, the Fund requests an order entering default judgment in its favor. ECF 25, at 2 ¶¶ 7–12.

---

[8] The amended complaint was also served on Defendants' counsel on October 26, 2023. ECF 19, at 1 ¶ 4.

[9] Mandy Dorman advised that she represents Defendants but has not filed an appearance in this case. ECF 19, at 1 ¶¶ 1, 3.

## II.    LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 55(a), "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." A Court may conduct hearings or make referrals when necessary to determine the damages, establish the truth of any allegation by evidence, or investigate any other matter. Fed. R. Civ. P. 55(b)(2). Thereafter, the Court may enter default judgment at the plaintiff's request and with notice to the defaulting party. *Id.*

While the United States Court of Appeals for the Fourth Circuit has announced a "strong policy" in favor of deciding cases on their merits, *United States v. Schaffer Equip. Co.*, 11 F.3d 450, 453 (4th Cir. 1993), default judgment may be appropriate when a party is unresponsive. *S.E.C. v. Lawbaugh*, 359 F. Supp. 2d 418, 421 (D. Md. 2005) (citing *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980)). A plaintiff, however, is not automatically entitled to default judgment simply because the defendant has not responded. Rather, entry of default judgment is left to the sound discretion of the Court. *See, e.g., Choice Hotels Int'l, Inc. v. Jai Shree Navdurga, LLC*, Civ. No. DKC-11-2893, 2012 WL 5995248, at *1 (D. Md. Nov. 29, 2012); *see also Choice Hotels Int'l, Inc. v. Austin Area Hospitality, Inc.*, Civ. No. TDC-15-0516, 2015 WL 6123523, at *1 (D. Md. Oct. 14, 2015).

As noted, when considering a motion for default judgement, the Court takes as true all well-pleaded facts in the complaint other than those related to damages. *Ryan*, 253 F.3d at 780; *see also* Fed. R. Civ. P. 8(b)(6) ("An Allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied."). The Court applies the pleading standards announced in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) in the context of default judgements. *See, e.g., Balt. Line Handling Co. v. Brophy*, 771 F. Supp. 2d 531, 544 (D. Md. 2011). A complaint that avers bare legal conclusions or "naked assertion[s] devoid of further factual enhancement," is insufficient to award default judgment. *Id.* ("The record lacks any specific allegations of fact that 'show' why those conclusions are warranted.") (internal quotation omitted). The Court "must, therefore, determine whether the well-pleaded allegations in [the] complaint support the relief sought." *Ryan*, 253 F.3d at 780. "The party moving for default judgment has the burden to show that the defaulted party was properly served and that the unchallenged factual allegations constitute a legitimate cause of action." *Harris v. Blue Ridge Health Servs., Inc.*, 388 F. Supp. 3d 633, 638 (M.D.N.C. 2019) (cleaned up).

If the complaint avers sufficient facts from which the Court may find liability, the Court next turns to damages. *See Ryan*, 253 F.3d at 780–81. The Court must make an independent determination regarding damages and cannot accept as true factual allegations of damages. *See Lawbaugh*, 359 F. Supp. 2d at 422. Damages are limited to that which is requested in the complaint. *See* Fed. R. Civ. P. 54(c) ("A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings."). While the Court may conduct an evidentiary hearing to determine damages, it is not required to do so; it may rely instead on affidavits or documentary evidence in the record to determine the appropriate sum. *See Monge v. Portofino Ristorante*, 751 F. Supp. 2d 789, 795 (D. Md. 2010) (collecting cases). "Although '[p]roceeding without a hearing is the exception,' the court may award damages without a hearing if 'the record supports the damages requested,' such as through comprehensive, detailed, and uncontroverted exhibit and affidavit evidence establishing the amount of damages." *Balt. Line Handling Co.*, 771 F. Supp. 2d at 541 (quoting *Monge*, 751 F. Supp. 2d at 794)).

7

### III.  **ANALYSIS**

Plaintiffs seek default judgement against Defendants. ECF 25. Before addressing whether Defendants are liable and, if so, what damages they are liable for, the Court addresses two threshold matters. First, the Court determines that Defendants were properly served and failed to file a responsive pleading. ECF 22; *see also* ECF 7-11. Second, the Court finds that it has subject matter jurisdiction over this action pursuant to 29 U.S.C. § 1451(c).[10]  Accordingly, the Court moves to consideration of the question of Defendants' liability.

#### A. Defendants' Withdrawal Liability

ERISA was enacted to promote and protect "'the interests of employees and their beneficiaries' by establishing 'minimum standards . . . assuring the equitable character of [employee benefit] plans and their financial soundness.'" *Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 440 (4th Cir. 2015) (quoting 29 U.S.C. § 1001(a)). "Multiemployer pension plans, structured in accordance with ERISA, provide for the pooling of contributions and liabilities." *Penske Logistics LLC v. Freight Drivers & Helpers Loc. Union No. 557 Pension Fund*, 820 F. App'x 179, 181 (4th Cir. 2020).

In order to "shore up the financial stability of multiemployer pension plans," *Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. BES Servs., Inc.*, 469 F.3d 369, 374 (4th Cir. 2006), "Congress in 1980 passed the Multiemployer Pension Plan Amendments Act (the 'MPPAA')[,]" which "requires that an employer withdrawing from a multiemployer pension plan pay a fixed and

---

[10] 29 U.S.C. § 1451(c) provides the Court with exclusive jurisdiction over an action to collect withdrawal liability for an act or omission by a party with respect to a multiemployer plan. Additionally, the Court has exclusive jurisdiction over this matter under 29 U.S.C. § 1132(e)(1), which is a broad jurisdictional provision concerning ERISA's civil enforcement. It grants federal district courts jurisdiction over actions brought under ERISA Title I (covering fiduciary duties, reporting, disclosure, and other plan administration aspects).

8

certain debt to the pension plan[,]" *Plumbing Servs.*, 791 F.3d at 440 (quoting *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 725 (1984)). "An employer owes withdrawal liability when it makes a complete or partial withdrawal from a pension plan." *Id.* (citing 29 U.S.C. § 1381(a)). "An employer's complete withdrawal occurs when an employer permanently ceases to have an obligation to contribute under the plan or permanently ceases all covered operations under the plan[.]" *Penske Logistics*, 820 F. App'x at 182 (citing 29 U.S.C. § 1383(a)). "When an employer withdraws from a multiemployer plan, the 'plan sponsor'—the designated administrator of the plan—is required to (1) determine the amount of the employer's withdrawal liability, (2) notify the employer of the amount of the withdrawal liability and schedule of liability payments, and (3) demand and collect the amount of the withdrawal liability from the employer in accordance with the schedule." *Int'l Painters & Allied Trades Indus. Fund v. Interiors by Steve, Inc.*, Civ. No. JRR-21-229, 2023 WL 4446572, at *3 (D. Md. July 11, 2023) (citing 29 U.S.C. §§ 1382, 1399(b)(1)), *report and recommendation adopted sub nom. Int'l Painters & Allied Trades Indus. Pension Fund v. Interiors by Steve, Inc.*, Civ. No. 21-229-JRR, 2023 WL 6973583 (D. Md. Aug. 17, 2023).

A "default" occurs when the employer fails to make withdrawal liability payments when due and "the failure is not cured within 60 days after the employer receives written notification from the plan sponsor of such failure[.]" 29 U.S.C. § 1399(c)(5)(A). "In the event of a default, a plan sponsor may require immediate payment of the outstanding amount of an employer's withdrawal liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made." *Id.*[11]

---

[11] *See also* ECF 25-3, at 93 (Pursuant to section 11.24(h) of the Fund Rules, following a "[w]ithdrawal [l]iability [d]efault, the [Fund] may require immediate payment of some or all installments that would otherwise be due in the future.").

An employer disputing the plan sponsor's assessment of withdrawal liability is permitted to submit an objection to the plan sponsor or can request that the plan sponsor review of any specific matter relating to its determination of the employer's liability and schedule of payments. 29 U.S.C. § 1399(b)(2)(A); *see also Plumbing Servs.*, 791 F.3d at 441. "An employer dissatisfied with the plan sponsor's response must demand arbitration within a 60-day period after the earlier of the date of the plan sponsor's notification that it has rejected the employer's request for review, or 120 days after the employer's request for review." *Plumbing Servs.*, 791 F.3d at 441 (citing 29 U.S.C. § 1401(A)(1)). "If . . . the employer does not pursue arbitration, the amount assessed by the plan sponsor as withdrawal liability 'shall be due and owing on the schedule set forth by the plan sponsor,' which may then 'bring an action in a State or Federal court of competent jurisdiction for collection.'" *Id.* (quoting 29 U.S.C. § 1401(b)(1)). "In such a circumstance, an employer is deemed to have waived review of all issues concerning the determination of withdrawal liability." *Id.* (citing *BES Servs.*, 469 F.3d at 375).

Plaintiffs' allegations in the amended complaint and attached exhibit(s) support the relief sought in this action. As alleged in the amended complaint, Defendants were "obligated to contribute" to the Fund within the meaning of 29 U.S.C. § 1392(a). ECF 17, at 4 ¶ 7. Exhibits provided by the Plaintiffs indicate that Defendants have contributed to the fund since 1999. *See* ECF 17-1, at 13 (listing Defendants' entry date as June 1, 1999). Defendants withdrew from the Fund on December 31, 2012. *Id.* In accordance with 29 U.S.C. § 1382, the Fund determined the amount of Defendants' withdrawal liability and notified it of that amount in its July 2020 Demand Letter. *See id.* at 10–12; *id.* at 4 ¶ 11. And, as fiduciary for the Fund, Plaintiff Williams is responsible for collecting that amount. ECF 17, at 3 ¶ 4.

Defendants have failed to file or serve any response to the Fund's complaint or amended complaint, enter appearance of counsel, or take any other action to demonstrate an intent to defend this suit. ECF 25, at 2 ¶¶ 7–9. Defendants never paid the withdrawal liability, nor did they ever request a review of or arbitration about the determinations set forth in the Demand Letter, as they could have under 29 U.S.C. §§ 1399(b) and 1401, respectively. ECF 17, at 5 ¶¶ 14–16. By letter on March 10, 2021, the Fund notified Defendants of their delinquency on their withdrawal liability and how to cure, *see* ECF 17-1, at 22–23, yet Defendants failed to cure the deficiency by the 60-day deadline and have not done so to this day, *id.* at 7 ¶ 24.

Accordingly, Defendants' failure constitutes a default under 29 U.S.C. § 1399(c)(5)(a).

### B. Damages and Fees Under ERISA

#### 1. Interest and Liquidated Damages

Defendants' § 1399(c)(5)(a) default entitles the Fund to "immediate payment of the outstanding amount of [Defendants'] withdrawal liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made." 29 U.S.C. § 1399(c)(5). In a civil action brought by a multiemployer plan to enforce an employer's obligation to pay withdrawal liability, a court must award a prevailing plaintiff the amount of the withdrawal liability, interest on that amount, and liquidated damages in an amount equal to the greater of the amount of interest or 20% of the withdrawal liability, as well as reasonable attorneys' fees and litigation costs. *See* 29 U.S.C. § 1132(g)(2) (listing amounts the court shall award in a judgement in an action to enforce an employer's obligations to make contributions to a multiemployer plan under 29 U.S.C. § 1145); *id.* § 1451(b) (providing that, in an action "to compel an employer to pay withdrawal liability," the employer's failure to pay withdrawal liability "shall be treated in the same manner as a delinquent contribution (within the meaning of section 1145 of this title)").

11

The calculation of Defendants' withdrawal liability was performed in accordance with the established rules. ECF 17-1, at 10–12; *see* ECF 25-3 (the Fund's rules and regulations (the "Fund Rules")); *see also* ECF 17-1, at 13 (detailing the calculation in an attachment to the Fund's Demand Letter). Based on the Defendants' historical contribution data, this calculation yielded a withdrawal liability amount of $70,608. *See* ECF 17-1, at 13. The methodology for determining the accrued interest on the withdrawal liability is provided in a declaration by Michael O'Malley, the Fund's Audit & Collections Director. *See* ECF 25-4 (the "O'Malley Declaration").

Interest, meanwhile, is calculated from the omitted payment due date to the date of actual payment. ECF 17, at 6 ¶ 21(1)(b). Under the Fund's Rules, the interest rate is determined "at the rate for underpayment of federal income taxes under [Internal Revenue Code §] 6621[.]" ECF 25-3, at 79; *see* 29 U.S.C. § 1132(g)(2) (interest "determined by using the rate provided under the plan, or, if none, the rate prescribed under [26 U.S.C. § 6621]"). However, the Fund, through O'Malley or otherwise, does not provide the specific interest rates it applied to calculate interest due. *See* ECF 25-4, at 2 ¶ 10 (stating he calculated the interest due—but not identifying the exact interest rates he used). Instead, the O'Malley Declaration points to Section 11.24(f) of the Fund Rules, which, in turn, references interest rates periodically set by the Pension Benefit Guaranty Corporation ("PBGC"). The O'Malley Declaration displays the resulting final amounts and totals in its attached exhibit. *See* ECF 25-4, at 8.[12]

---

[12] While the Demand Letter outlines an option to pay the withdrawal liability in 24 total payments, ECF 17-1, at 11, the O'Malley Declaration presents a payment schedule listing only 19 total payments, ECF 25-4, at 8. This adjustment appears to be pursuant to § 11.24(g) of the Fund Rules, "[i]f, following review, arbitration or other proceedings, the amount of the Control Group Employer's Withdrawal Liability is determined to be different from the amount set forth in the notice and demand, the adjustment shall be made by reducing or increasing the total number of installment payments due." ECF 25-3, at 93.

The Fund's use of various "initial" payment dates creates inconsistencies in the interest calculation. Although the first payment was originally due on or before September 6, 2020, Plaintiffs' Motion requests interest calculated from "September 8, 2020," representing an interest amount of $4,131.72. *See* ECF 17-1, at 22; ECF 25, at 2 ¶ 12. Correspondingly, Plaintiffs' brief supporting the Motion asserts this September date and the same $4,131.72 interest amount. ECF 25-2, at 4; *id.* at 7. Adding to the confusion, the O'Malley Declaration states that the Fund's Audit & Collections Director calculated interest through February 28, 2025, pursuant to the Fund Rules, *see* ECF 25-4, at 2 ¶ 10; however, his calculations use August 7, 2023, as the initial due date for the first withdrawal liability payment yet still arrive at the same $4,131.72 interest amount as the calculations starting on September 8, 2020. *Id.* at 8.

The Fund's interest calculation will be based on the August 7, 2023 start date rather than the originally scheduled September 6, 2020 date or the purported September 8, 2020 date, even though this results in a lower total interest amount. This approach accords with the approach taken by other courts in this district. For example, in *Trustees of the National Automatic Sprinkler Industry Welfare Fund v. Security Fire Protection, Inc.*, the plaintiffs alleged that the defendant defaulted by failing to stay current on monthly payments and by failing to pay owed contributions but sought different amounts for the same charge in the complaint and in their motion for default judgement. Civ. No. 10-3573-DKC, 2011 WL 5034800, at *2 (D. Md. Oct. 21, 2011). There, the court, finding both figures reasonable based on differing interpretations of the trust agreement's language, concluded that such ambiguity should not be resolved on a motion for default judgment. *Id.* at *5. As a result, the court deferred to the Plaintiffs' initial request, awarding the unpaid amount at the lower amount stated in the complaint. *Id.*

In the present case, although Plaintiffs assert different initial payment dates, the interest amount requested remains the same. It is unclear whether Plaintiffs intended for interest to begin accruing in September 2020 or August 2023. Plaintiff asserts that following effective service of the complaint[13]—and based on the position that service of the complaint constitutes notice of the Fund's assessment of withdrawal liability, *see* ECF 17, at 4 ¶ 12—under the standard set by 29 U.S.C. §§ 1399(b) and 1401, no Defendant requested a review of the liability or initiated arbitration of the Fund's determinations. ECF 17, at 5 ¶ 15–16. Plaintiff further contends that, because Defendants did not exercise their rights to review or arbitration following service of the complaint, the findings were final. *Id.* at 5 ¶ 17. By treating service of the complaint as notice and asserting that no request for review was received, Plaintiff insinuates that Defendant's first payment was due 60 days after service of the complaint, pursuant to section 11.28 of the Fund Rules, thereby effectively establishing August 2023 as the start date for the payment schedule. Given the Fund's authority to set the payment schedule following a default determination and the ambiguity surrounding the interest start date, this discrepancy is not appropriate for resolution on a motion for default judgment. Instead, the Court will award interest consistent with the Plaintiff's position as reflected in the operative complaint. *See Security*, 2011 WL 5034800, at *5.

The payment schedule for the withdrawal liability commenced on August 7, 2023, with monthly payments due on the first thereafter, consistent with the O'Malley Declaration. *See* ECF 25-4, at 8. Because interest on withdrawal liability is calculated from the omitted payment due date to the date of actual payment, and payments were scheduled over a three-year period, each

---

[13] ECF 17, at 4 ¶ 13 (effective service on all Defendants by June 7, 2023).

14

successive payment accrued interest at different rates.[14] The Fund calculated $4,131.72 in interest through February 28, 2025.[15] *See* ECF 25-4, at 2 ¶ 10; *see id.* at 8. The interest rates for these calculations come from PBGC, as required by the Fund Rules. ECF 25-3, at 93 (Section 11.24(f) states: "Interest shall accrue on any late payment from the date the payment was due until the date paid in accordance with PBGC regulations."). Interest has continued to accrue since August 7, 2023, and at current rates, increases by approximately $12.69 each day.[16]

Finally, pursuant to 29 U.S.C. § 1132(g)(2)(C), the amount of liquidated damages in this case is determined by the greater amount of the interest on withdrawal liability or 20 percent of withdrawal liability. Twenty percent of the $59,660.00 withdrawal liability is, as the Fund claims, $11,932, which is greater than the amount of interest currently owed. The Court thus finds that the Fund is entitled to liquidated damages in the amount of $11,932.

The default judgment entered in this case will include awards of $59,660.00 in withdrawal liability; $4,131.72 in accrued interest, plus all additional interest that has accrued through the date of this judgment; and $11,932 in liquidated damages.

---

[14] PBGC publishes interest rates quarterly. *See Late or defaulted withdrawal liability*, PBGC (last updated June 18, 2025), https://www.pbgc.gov/employers-practitioners/interest-rates/late-defaulted-withdrawl-liability. PBGC established an annual rate of 8.25% for the third quarter of 2023, which increased to 8.50% for the fourth quarter of 2023 and remained at 8.5% throughout 2024. *Id.* The annualized interest rate lowered to 7.75% for the first quarter of 2025 and remained at 7.50% for the second and third quarters. *Id.*

[15] Using the interest rates published by PBGC for the period from August 7, 2023, through February 2025, the Court's calculations produced an interest amount consistent with the O'Malley Declaration determinations. Accordingly, the court will rely on Plaintiffs' competent document displaying the final amounts.

[16] The figure is computed by subtracting the $4,524.41 interest accrued as of March 31, 2025, from the $4,905.10 accrued as of April 30, 2025, and dividing the difference by the 30 days in the period. *See* ECF 25-4, at 9–10.

2. Attorneys' Fees and Costs

The Fund also seeks an award of attorneys' fees and costs, which are available in ERISA

cases. 29 U.S.C. § 1132(g)(2). Upon entering judgement in favor of a plaintiff in an ERISA action

for a plan to recover unpaid contributions, a court "shall award the plan . . . reasonable attorneys'

fees and costs of the action, to be paid by the defendant." *Id.* In calculating an award of attorneys'

fees, a court must determine the lodestar amount, defined as a "reasonable hourly rate multiplied

by hours reasonably expended." *Grissom v. Mills Corp.*, 549 F.3d 313, 320–21 (4th Cir. 2008).

The Fourth Circuit has held that a court's

> discretion should be guided by the following twelve factors: (1) the time and labor
> expended; (2) the novelty and difficulty of the questions raised; (3) the skill
> required to properly perform the legal services rendered; (4) the attorney's
> opportunity costs in pressing the instant litigation; (5) the customary fee for like
> work; (6) the attorney's expectations at the outset of the litigation; (7) the time
> limitations imposed by the client or circumstances; (8) the amount in controversy
> and the results obtained; (9) the experience, reputation and ability of the attorney;
> (10) the undesirability of the case within the legal community in which the suit
> arose; (11) the nature and length of the professional relationship between attorney
> and client; and (12) attorneys' fees awards in similar cases.

*Robinson v. Equifax Info. Servs.*, LLC, 560 F.3d 235, 243 (4th Cir. 2009). In addition, Appendix

B to this Court's Local Rules ("Rules and Guidelines for Determining Attorneys' Fees in Certain

Cases") provides that lawyers admitted to the bar for twenty years or more may reasonably bill

$300 to $475 per hour and that lawyers admitted to the bar for less than five years may reasonably

bill $150 to $225. Paralegals and law clerks may reasonably bill $95 to $150. While fee matrices

can be a "useful starting point to determine fees[,]" the court must consider all relevant evidence

when assessing the reasonableness of attorney fees and "may not elevate a matrix above all other

types of evidence or treat a matrix as establishing a presumptive answer or range of answers." *De*

*Paredes v. Zen Nails Studio LLC*, 134 F.4th 750, 753–54 (4th Cir. 2025) (quoting *Newport News*

*Shipbuilding & Dry Dock Co. v. Holiday*, 591 F.3d 219 (4th Cir. 2009)).

16

Until June 2022, Jennings Sigmond, P.C. represented the Fund in all of its withdrawal liability matters. ECF 25-4, at 2 ¶ 6. From June 2020 to April 2022, Jennings Sigmond, P.C. has billed the Fund $9,999.00 for attorneys' fees and $5,590.53 for expenses in connection with the "Contract Wallcovering, Inc." matter. *Id.* at 2 ¶ 7; *see also id.* at 4.[17]  In June 2022, Tucker Arensberg, P.C. assumed the Fund's withdrawal liability matters. *Id.* at 2 ¶ 6.

Thereafter, the Fund has been represented by Kathleen A. Nandan of the law firm Tucker Arensberg, P.C. *See* ECF 17. According to the Motion and its attachments, the Fund has also been represented by Neil J. Gregorio, with the assistance of two paralegals, Rachel M. Bergman and Lori L. Buckreis, all from Tucker Arensberg. *See* ECF 25-5, at 1–2 ¶¶ 4, 10–12.

Nandan has been a licensed attorney for nearly 30 years. ECF 25-5, at 1 ¶ 10. She charged an hourly rate of $350, $365, and $400, in the years 2022, 2023, and 2024, respectively. *Id.* at 3–4 ¶ 13. These rates are within the guidelines set forth in the Local Rules. Gregorio, when he worked on the case in 2023, had been a licensed attorney for about 20 years. *See id.* at 2 ¶ 7. He charged an hourly rate of $325 in 2023. *Id.* at 3–4 ¶ 13. Consistent with its historical use of the local guidelines, the Court finds the attorneys' hourly rates to be reasonable. *See Int'l Painters & Allied Trades Indus. Pension Fund v. Cap. Restoration & Painting Co.*, 919 F. Supp. 2d 680, 689 (D. Md. 2013); *Int'l Painters & Allied Trades Indus. Pension Fund v. 3 R Painting & Contracting Co.*, Civ. No. RDB-12-272, 2013 WL 424694, at *9 (D. Md. Jan. 31, 2013); *see also Int'l Painters*

---

[17] Exhibit B-1 of ECF 25-4, titled "Jennings Sigmond, P.C. Time And Expense Details," itemizes billed hours, rates, and narratives, but identifies timekeepers only by their initials. The $375 hourly rate, consistently applied by KGC, RJD, and JAS across 2020, 2021, and 2022, appears consistent with attorneys admitted to the bar for twenty years or more.  However, assessing the reasonableness of this rate and its adherence to established guidelines requires knowing each attorney's bar admission date. Similarly, the $120 hourly rate, consistently billed by LJP, NAF, NF, and SC from 2020 through 2022, is consistent with billing for paralegals and appears reasonable under applicable guidelines.

*& Allied Trades Indus. Pension Fund v. Madison Coatings Co.*, Civ. No. SAG-17-1559, 2019 WL 5625759, at *6 (D. Md. Oct. 31, 2019) ("The Guidelines are not definitive, but are designed 'solely to provide practical guidance to lawyers and judges when requesting, challenging and awarding fees.' Loc. R. App'x B.3 n.6. However, the Court typically weighs the Guidelines heavily in determining the reasonableness of fees sought.").

Bergman billed hourly rates of $185 in 2023 and $200 in 2024. ECF 25-5, at 3–4 ¶ 13. Buckreis billed an hourly rate of $185 in 2023. *Id.* The paralegal rate, as Plaintiffs point out, *see id.* at 4 ¶ 15, exceeds the guidelines rate for paralegals of $95 to $150 per hour. While Plaintiffs argue that such experience results in overall cost savings to the client despite the higher rate, *id.*, the Court finds it appropriate to reduce the paralegal hourly rate to align with the Local Rules.

Although not challenged, Plaintiff's description of its paralegal work fails to justify a departure from this Court's Local Rules or to substantiate the elevated hourly rates requested. *See Int'l Painters & Allied Trades Indus. Fund v. Interiors by Steve, Inc.*, Civ. No. JRR-21-229, 2023 WL 4446572 (D. Md. July 11, 2023). In *Interiors by Steve*, despite the defendants never answering or asserting a defense, the court independently recommended reducing the paralegal rate from $185 to $115 per hour for 19.7 hours of billed time. *Id.* at *8. The court found no indication that the case presented particularly novel or complex legal or factual issues, nor that the amount of withdrawal liability warranted elevated fees. *Id.* Accordingly, the court applied the lower rate and reduced the plaintiff's attorneys' fee award. *Id.* at *11.

In this case, plaintiffs have not presented sufficient evidence or supporting documentation to justify the elevated paralegal rate. According to Plaintiffs' attorney invoices, the paralegals' work included tasks such as conducting background research on Defendants, labeling exhibits, and performing various functions related to the complaint. *See* ECF 25-4, at 4–7; *see* ECF 25-5, at 6–

18

38. This type of work does not persuade the Court that the matter involved unusual complexity or difficulty sufficient to warrant the high fees requested. *See Interiors by Steve*, 2023 WL 4446572, at \*11. Similarly to *Interiors by Steve,* the paralegals here had comparable experience—over 20 years of experience handling hundreds of ERISA cases for firm clients. *Id.* at \*8. Accordingly, this Court will reduce the hourly rate for paralegal work to $115.

In addition to finding the hourly rates to be reasonable, the Court must exclude from any fee award the time expended on unsuccessful claims that are unrelated to the successful claims. *Crump v. United States Dep't of Navy by & through Mabus,* 245 F. Supp. 3d 692, 699 (E.D. Va. 2017). Reasonable hours, as the Supreme Court noted, necessitates the "exercise of 'billing judgement' to eliminate hours that are 'excessive, redundant, or otherwise unnecessary.'" *Davidson v. Cook,* 594 F. Supp. 418, 424 (E.D. Va. 1984) (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 434 (1983)). Accordingly, it is the duty of the Court to "determine the number of hours reasonably expended by plaintiff's counsel." *Cook,* 594 F. Supp. at 424.

Plaintiffs' attorneys expended significant legal resources over the course of 5 years addressing the "Contract Wallcovering, Inc." matter. *See* ECF 25-4, at 4–7; *see* ECF 25-5, at 6–38. This period encapsulates, among other things, the time spent on the Demand Letter and Default Letter, expenses resulting from the [w]ithdrawal [l]iability [c]omplaint, and time dedicated to reviewing materials after the change of counsel, communicating with opposing counsel, amending the complaint, and filing subsequent motions. ECF 25-4, at 4–7; ECF 25-5, at 6–38. The Court finds that the time these attorneys and paralegals spent working on this case, 94.3[18] hours total, is

---

[18] This figure is computed by adding the total hours worked by Jennings Sigmond, P.C. and Tucker Arensberg, P.C. *See* ECF 25-4, at 6 (showing 37 hours on the bill); ECF 25-5, at ¶ 17 (billing 57.3 total hours).

nonetheless too high since it includes non-recoverable compensation for time spent on tasks related to a previous lawsuit or were tasks later duplicated by replacement counsel.

In *Interiors by Steve*, then-Magistrate Judge Maddox recommended that the court decline to award attorneys' fees for pre-litigation work related to the assessment of withdrawal liability and other nonrecoverable efforts to collect that liability. 2023 WL 4446572, at *9. Judge Maddox took that approach based on the reasoning in *United Plant & Production Workers Local 175 Pension Fund by Kilkenny v. J. Pizzirusso Landscaping Corp.*, where the distinction was drawn between recoverable pre-filing fees that directly supported the litigation and nonrecoverable fees related to routine pre-suit tasks, such as calculating and collecting withdrawal liability. *Id.* (citing No. 20-cv-2527 (RJD) (CLP), 2022 WL 4139160 (E.D.N.Y. Aug. 9, 2022)). As a result, Judge Maddox recommended that compensable time begin when litigation preparation actually commenced, more specifically, on the date "when a conference was held regarding the [c]omplaint." *Id.*

In this case, work on the present federal civil action commenced when the Fund's matter was transferred to Tucker Arensberg, P.C. While the Fund was previously represented by Jennings Sigmond, P.C., the billing narratives provided by that firm reflect that the hours expended during that period were devoted to generally investigating withdrawal liability. *See* ECF 25-4, at 4–5. Of course, the narratives also reference time spent on tasks that may have been related to an earlier-filed federal lawsuit against the same defendants. *See International Painters and Allied Trades Industry Pension Fund, et al. v. Contract Wallcovering, Inc., et al.*, Civ. No. 22-154-LKG (filed 1/20/2022). These tasks include, for example, "reviewing Judge Griggsby Courtesy Copy Preference." *Id.* at 5. However, that prior case was voluntarily dismissed. *See* ECFs 5 and 6 in Civ. No. 22-154-LKG. And subsequent billing records make clear that whatever work was

20

performed on the prior federal lawsuit, to the extent even recoverable, was not utilized by Tucker Arensberg, P.C. in the present action.

Following a period of review of the transferred file, Tucker Arensberg, P.C. began actively litigating the instant matter in federal court, as evidenced by attorney Neil Gregorio's billing entry reflecting "directing case strategy" beginning on March 6, 2023. *See* ECF 25-5, at 11. Attorney Gregorio's accompanying affidavit reflects that the time for which Tucker Arensberg, P.C. seeks compensation, including "investigative research to locate an address for the owner of Defendants, *drafting of the Complaint* and Motion for Default Judgment and Memorandum of Law in support thereof." *Id.* at 5 ¶ 19 (emphasis added). Billing records also notes that the new firm had to "*begin* drafting [a] complaint," *id.* at 11 (emphasis added), implying that whatever work was done previously in that regard was being replaced. Because Tucker Arensberg, P.C. filed the complaint in this case shortly thereafter, *see* ECF 1, the Court will treat the assumption of the matter by that firm as the start date for the accrual of attorney's fees and will exclude the hours provided by Jennings Sigmond, P.C. from Plaintiffs' requested $27,106.50 in fees. Even if technically related to the instant lawsuit, in light of Tucker Arensberg P.C.'s request for compensation for many of the same tasks and noting the earlier dismissal of the prior lawsuit, such fees would be "excessive, redundant, or otherwise unnecessary." *Davidson*, 594 F. Supp. at 424.

Further, the Court's research on the matter reveals that the $27,106.50 amount requested in attorney fees is out of proportion with fees awarded in similar cases upon default judgment. *See, e.g., Int'l Painters & Allied Trades Indus. Pension Fund v. Cap. Restoration & Painting Co.*, 919 F. Supp. 2d 680, 683 (D. Md. 2013) (awarding Plaintiffs attorneys' fees and costs in the amount of $4,017.48); *Int'l Painters & Allied Trades Indus. Pension Fund v. Gordon Sign Co., LLC*, Civ. No. 24-0096-BAH, 2025 WL 660210, at *6 (D. Md. Feb. 28, 2025) (awarding Plaintiffs

attorneys' fees in the amount of $11,474.00); *Interiors by Steve, Inc.*, 2023 WL 4446572, at *3 (awarding Plaintiffs attorneys' fees and costs in the amount of $9,363). After thoroughly reviewing the submissions in support of attorneys' fees and weighing the relevant factors detailed in *Robinson*, the Court will award the Fund attorneys' fees in the amount of $15,313.[19]

Excluding the costs incurred by Jennings Sigmond, P.C., the Fund—through Tucker Arensberg, P.C.—incurred a total of $1,020.80 in recoverable costs. ECF 25-5, at 5 ¶ 18. Accordingly, the Court will award the Fund $1,020.80 in costs.

In total, the court will award to the Fund $92,057.52 in damages against Defendants. This amount comprises $59,660.00 in withdrawal liability; $4,131.72 in accrued interest, plus all additional interest that has accrued through the date of this judgment; $11,932.00 in liquidated damages; $15,313 in attorneys' fees; and $1,020.80 in costs.

## IV.    **CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion will be granted.

A separate implementing Order will issue.

Dated: <u>September 5, 2025</u>

<u>                    /s/                    </u>
Brendan A. Hurson
United States District Judge

---

[19] This figure is computed by omitting the attorney fees incurred by Jennings Sigmond, P.C. and reducing the hourly rate for paralegals working for Tucker Arensberg, P.C.